[No. 25360. Department One. August 13, 1935.]

WILBUR MERIWEATHER *et al., Respondents*, v. GEORGE A. PETERSON *et al., Appellants.*[1]

W. H. Abel, Edward W. Mathewson, and· John I. O'Phelan, for appellants.

Welsh & Welsh, for respondents.

GERAGHTY, J.—Plaintiffs, being in possession of a five-acre tract of land, under contract of purchase, in

[1]Reported in 48 P. (2d) 220.

the east half of the northeast quarter of section 33, township 11, north range 11, W. W. M., brought this action to enjoin the defendants, owners of the northwest quarter of section 34, same township and range, adjoining on the east the legal subdivision in which plaintiffs' tract is situate, from obstructing the flow of water from Cranberry lake, upon which plaintiffs' land abuts, through a ditch on defendants' land, running from the east line of section 33 to the east line of the northwest quarter of section 34, and thence through a ditch identified in the record as the Gile ditch to Willapa bay. Plaintiffs in their complaint also asserted a right to the maintenance of a ditch on the north line of defendants' land, from Cranberry lake easterly the full length of the northwest quarter, with three laterals therefrom running south to the ditch first referred to. The plaintiffs also sued for damage to their land resulting from the stopping of the flow of water through the south ditch by the defendants.

The case was tried to the court without a jury, and a decree entered awarding plaintiffs nominal damages in the sum of one dollar and giving them the right to clean and maintain the south ditch under conditions specified in the decree. As to the north ditch and the laterals running south, the court held against the claimed right of the plaintiffs, who have taken no appeal from that part of the decree. The defendants appeal from the decree in so far as it grants to plaintiffs any of the relief prayed for in their complaint.

Prior to 1883, Robert Chabot was the owner of the east half of the northeast quarter of section 33 and the northwest quarter of section 34, and had established bogs for the cultivation of cranberries on a portion of his land in the northwest quarter of section 34. The land here involved is situate on the peninsula,

about two miles in width at this point, lying between the Pacific ocean and Willapa bay in Pacific county. The district is low-lying and marshy, with small lakes dotting its surface. Cranberry lake lies partly in the east half of the northeast quarter of section 33 and extends northerly into other land not here involved.

Cranberry road runs easterly from the Pacific ocean to the Sandridge road, a north and south road, parallel with Willapa bay but some distance inland. Cranberry road is on appellants' land, near its south boundary, and is a public road in common use, although the right of way was never formally dedicated. The south end of Cranberry lake is about thirteen hundred feet north of Cranberry road. The intervening land is low and marshy.

For the purpose of cultivating his cranberry bogs, Chabot constructed a ditch on the north line of the northwest quarter of section 34 and also constructed three laterals running south from the north ditch to the south line of the quarter section. He built a head gate at the outlet to the ditch from Cranberry lake, in order to control the flow of water into the ditch. He also constructed head gates in the lateral ditches. The water thus controlled was used to flood the bogs when seasonal flooding became necessary.

To furnish an outlet from this system of ditches east to Willapa bay, Chabot acquired from one Gile, who owned the land bordering on the bay, an easement for a ditch from the southeast corner of the northwest quarter to the bay. He constructed a ditch westerly near the south line of section 34, and on the north side of Cranberry road. The ditch was carried beyond the westerly lateral; how far does not definitely appear. For the purpose of controlling the water in Cranberry lake and maintaining it at a level that would enable him to obtain water for the north ditch when necessary

to flood his cranberry bogs, Chabot constructed a dike at the south end of the lake.

In 1883, Chabot conveyed his land in sections 33 and 34 to the Pacific Cranberry Company. In 1904, the Pacific Cranberry Company conveyed all of the land to J. M. Arthur. In 1911, Arthur conveyed the northwest quarter of section 34 to the Pacific Cranberry Marsh. On January 5, 1917, Pacific Cranberry Marsh conveyed the northwest quarter to George H. Gould, and in 1926, through mesne conveyances, the appellants came into possession of it. On January 6, 1917, Arthur conveyed the land in section 33 to the Portland Trust Company, which company, in turn, conveyed to the Bi-State Investment Company in 1926. The Bi-State company thereafter made a plat subdividing its land into small numbered tracts, and the respondents acquired their interest through a written agreement with the Bi-State company in January, 1932.

While Arthur conveyed the northeast quarter of section 34 to Pacific Cranberry Marsh in 1911, the cranberry bogs, developed originally by Chabot on the northwest quarter of section 34, remained in cultivation until 1917, and Arthur continued in control of its operations until that year. About 1919, the bogs were abandoned, and the ditches were permitted to fall into disrepair and become more or less filled with earth and debris. Since taking possession of the northwest quarter in 1926, appellants have improved the land as a dairy farm with a home and other substantial improvements. It does not appear that any attempt was ever made to reclaim the land in that part of section 33 where respondents' land lies, prior to its acquisition by the Bi-State company.

Respondents' tract of land abuts on Cranberry lake and is under water when the lake is at its normal level. After coming into possession of the tract, they sought

to reclaim it as a cranberry bog by lowering the water in the lake. They cut the dike at the south end of the lake and dug a shallow ditch through to carry the water south to Cranberry road and east through what is called the Arthur ditch. This ditch had been dug by Arthur in 1914-1915.

Whether this ditch extended easterly to a connection with the Chabot ditch is one of the principal questions of fact in the case. Respondents contend that the two ditches connected and that there was a continuous flow eastward from section 33 through the Chabot ditch. The appellants contend that the short ditch dug by Arthur near the west line of appellants' land was for some immediate drainage and not as a connection with the Chabot ditch, and that there was a stretch of two hundred eighty feet between the Arthur and Chabot ditches where no ditch was ever dug.

The court found that the north ditch and southerly laterals were not intended for draining Cranberry lake, but for flooding the bogs. It reached the conclusion that the south ditch had existed at one time, in some form, for the full length of the northeast quarter, for the purpose of draining the water from Cranberry lake, and that respondents had a right to clean it out and restore it to use for the purpose of lowering Cranberry lake and draining their land.

The court itself did not appear to be very certain of the physical conditions formerly existing, because, in commenting on the two-hundred-eighty-foot stretch, he said, in his memorandum opinion:

"There is evidence in the record showing that there was either a depression or a distinct ditch through this so-called 280 feet now in controversy, and which was a part of the Chabot-Arthur ditch. It is not of controlling importance just how the water ran at different periods of the season, but I think on the whole of

the evidence that it ran westward [eastward] to Willapa Bay.

"Whatever action the court takes in the present case should be in favor of a practical ditch both in the present and future and a drainage ditch that will reasonably function and be as efficient as the possibilities will permit."

And the court, further speaking of the ditch, said:

"I mean that the depth of the ditch may have to be deepened along the two hundred feet [two hundred eighty] referred to in the testimony and perhaps in some other places, but such deepening will not be done to more than the level of the ditch in the balance of the route, and I think the ditch should be operated in a practical manner so as to be efficient."

There is no claim that the ditch in controversy is public, into which the respondents may drain their land as of common right. Whatever the extent of the ditches constructed by Chabot and Arthur, they were for their own private use. At the time when title held in common was severed by conveyance to different grantees, no reference was made to the existing ditches, nor were any rights otherwise granted or reserved. If respondents have a right to clean out and maintain the south ditch, it can be only by an implied easement resulting from the severance of ownership and the existence of physical conditions sufficient in law to establish the easement. Our reading of the record does not support the court's finding of the existence of the south ditch westward to respondents' land. We have quoted from the court's reference to the two-hundred-eighty-foot strip where the construction of any ditch was disputed.

Mr. William O. Owen, an engineer called as a witness by respondents, in testifying as to this two-hundred-eighty-foot stretch, said:

"Q. [By Mr. O'Phelan] It would not be possible would it to drain water coming thru a ditch that was

.95 feet and four feet across thru this depression which you spoke about on the ridge, which was .95 feet below the level, without spilling around on the land? A. I don't believe it would. Q. You could not drain it thru there? A. No, there would be an overflow at that point. Mr. Welsh: Q. What would be the effect if the ditch was cleaned out at that point? A. I would say that it would have to be enlarged to carry the water. Mr. O'Phelan: . . . Q. You have had some construction experience? A. Yes. Q. Would you say this .95 feet depression had been dug as a drainage ditch? A. I will tell you my own idea, I had the idea that originally had been the ditch and had been filled up to that point, it looked like the outlines of the ditch. Q. Could you tell from the vegetation how long it had been filled up? A. I would say a good many years. Q. Many years? A. Yes. Q. Could you estimate the number of years at all? A. No, I could not.''

Conceding that there formerly existed some semblance of a continuous ditch as the court found, it does not necessarily follow that an implied easement exists in favor of the respondents' land.

''Three things are regarded as essential to create an easement by implication; first, 'a separation of the title; second, that, before the separation takes place, the use which gives rise to the easement shall have been so long continued and so obvious or manifest as to show that it was meant to be permanent; and, third, that the easement shall be necessary to the beneficial enjoyment of the land granted or retained.' 9 R. C. L. 757.'' *Bailey v. Hennessey,* 112 Wash. 45, 191 Pac. 863.

To the same effect, *Berlin v. Robbins,* 180 Wash. 176, 38 P. (2d) 1047.

As we have seen, the severance here took place when Arthur conveyed, without reservation, the northwest quarter of section 34 in 1911. This was before the construction of the Arthur ditch and when there was no suggestion of a ditch draining respondents' land to-

ward Willapa bay. From 1917 or, at the latest, 1919, the south ditch was abandoned, so much so that, as we have seen, its existence in the two-hundred-eighty-foot stretch was so uncertain that the respondents' own engineer could only assume a ditch had once existed. Clearly, we have not here a use "so long continued and so obvious or manifest as to show that it was meant to be permanent." Nor was the land in section 33, prior to the attempted improvement of the respondents, ever put to any beneficial use requiring drainage.

The trial court, in reaching its conclusion as to the right of respondents, was largely influenced by the language of the easement from Gile to Chabot, for an outlet to Willapa bay. This easement granted

" . . . a right of way and permission to dig, open and establish, and perpetually maintain a drainage ditch of proper and suitable depth and width to drain certain lands, lakes, pools and water which may now or hereafter be upon any portion of said Chabot's land within Section 34, Township 11, N. Range 11, West of W. M., and also any other land or water upon any other land which may now or hereafter be owned by said Chabot in Pacific County."

We think the court over-stressed the importance of this easement in the present controversy. It is true that, as against Gile, Chabot and his successors in interest could use the outlet for draining all the lands owned by him, but when his successors severed the title without reservation, in the absence of physical improvements giving rise to an implied easement, one of the grantees could not assert a right to maintain a drain over the land of another grantee merely because originally the Gile easement was available to the whole tract. Neither does it appear from the record that the south ditch was ever used as a means of drainage for Cranberry lake, because, as we have seen, Chabot's

plan for improvement of the bog involved the directing of the water of the lake into the north ditch.

The judgment will be reversed, with direction to dismiss.

BEALS, MAIN, and TOLMAN, JJ., concur.